**AKRON, CANTON & YOUNGSTOWN RAILROAD COMPANY et al., Plaintiffs,**

**v.**

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS et al., Defendants.**

No. 64 C 2048.

United States District Court
N. D. Illinois, E. D.

Dec. 24, 1964.

Howard Neitzert, Sidley, Austin, Burgess & Smith, Charles I. Hopkins, Jr., James R. Wolfe, Chicago, Ill., for plaintiffs.

Alex Elson, Willard J. Lassers and Aaron S. Wolff, Elson, Lassers & Wolff, Chicago, Ill., for defendants.

PERRY, District Judge.

This cause, arising under the Railway Labor Act, comes on to be heard upon complaint and answer, a hearing in open court having been had upon motion for preliminary injunction after the granting of a restraining order.

Inasmuch as both parties have been permitted to present exhaustive evidence and argument of the law which the court has heard and considered, the court is

of the opinion that any additional evidence would be cumulative and repetitious.

Therefore, the court on its own motion chooses to make final disposition of the cause at this time instead of ruling upon the motion for preliminary injunction now and then at a later time hearing possibly the same evidence and argument upon a motion for a permanent injunction. The importance of the case to the general public and the efficient use of judicial processes demand such a course of action.

The court makes findings of fact and states conclusions of law as follows:

### FINDINGS OF FACT AS TO COUNT I

1. Each of plaintiffs is a common carrier by railroad engaged in Interstate Commerce; and each of the plaintiffs is a "carrier" as that term is defined in Section 1 of the Railway Labor Act (45 U.S.C.A. § 151). (Tr. 341)

2. Defendants International Brotherhood of Electrical Workers, International Association of Machinists, and Sheet Metal Workers' International Association (hereinafter referred to as defendant unions) are voluntary, unincorporated associations and labor organizations. The individual defendants are officers or agents of the defendant unions, and sued individually and as representatives of the officers and members of the defendant unions. The employees of plaintiffs who are members of the defendant unions (hereinafter referred to as class defendants) are so numerous as to make it impracticable to bring them before the Court, but the individual defendants fairly and adequately represent such class defendants for the purposes of these proceedings. (Tr. 341)

3. This is a suit to enjoin a strike of the plaintiffs' employees who are members of the defendant unions, which was called by the officers of said unions on December 8, 1964, to become effective at 6 a. m. on Tuesday, December 15, 1964, and which was postponed following the entry of a temporary restraining order by this Court on December 14, 1964, until after January 1, 1965. (Tr. 61–69; DX 13)

4. The purpose of the threatened strike was and is to compel the plaintiffs to bargain and to negotiate with each of the individual defendant unions and to enter into an agreement with each of said unions concerning the wages and rates of pay of plaintiffs' employees who are members of such respective unions. (Tr. 156–170)

5. Plaintiffs conduct approximately 90 percent of all common carrier railroad operations in the United States. Their properties and operations are integral parts of the nation's transportation system and connect with and operate in conjunction with other surface and air transportation systems. The strike which plaintiffs seek to enjoin would curtail or prevent such operations; would interfere with the movement of freight and passengers throughout the nation, contrary to public interest and national welfare; would deprive employees of the plaintiff of their employment during the duration of said strike; and would result in substantial and irreparable damage and injury to the plaintiffs. (Tr. 341)

6. The shop employees of each of the plaintiffs, including the class defendants and the employees of the plaintiffs who are members of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, the Brotherhood Railway Carmen of America, and the International Brotherhood of Firemen, Oilers, Helpers, Round House and Railway Shop Laborers (which are also unincorporated associations and labor unions) are represented for purposes of collective bargaining under the Railway Labor Act (45 U.S.C.A. § 151, et seq.) as a single bargaining unit by the Railway Employees' Department, AFL-CIO and its constituent System Federations. (Tr. 334, 544–547; DX 31; PX 10; PX 126–149; PX 170)

7. The Railway Employees' Department, chartered by the American Federation of Labor in 1908, is a collective bargaining entity of which the six labor

organizations named supra are affiliated components. (Tr. 341, 521–522, 716; PX 12, p. 9) The officers of the Department are a President, Secretary-Treasurer and Executive Council. (PX 12, p. 12; DX 23, p. 12) The chief executive officer or a designated alternate of each of the affiliated organizations comprise the Executive Council of the Department, which is its governing body. (PX 12, pp. 12, 14; Tr. 714) On all matters relating to collective bargaining and the negotiation and making of agreements with the plaintiffs concerning the wages and rates of pay of plaintiffs' shop employees, the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers has two Executive Council votes. (PX 12, pp. 11, 12; Tr. 744–745)

8. The System Federations of the Railway Employes' Department are subordinate components of the Department chartered by the Department to represent the Department on one or more individual railroad systems. (Tr. 522–523, 755–756, 758–759; PX 12, p. 34) The governing body of a System Federation is its Executive Board, which consists of the General Chairman of each of the affiliated unions. (Tr. 746–747) System agreements, containing the stipulated and agreed rates of pay of plaintiffs' shop employees, are executed for the System Federations by such General Chairmen in their capacities as members of the System Executive Boards. (Tr. 753–759, 785; PX 12, p. 34)

9. The National Mediation Board, pursuant to the provisions of Section 2 of the Railway Labor Act (45 U.S.C.A. § 152), has found and certified that the Railway Employes' Department, or one or more of its subordinate component System Federations, or one or more of its affiliated component unions operating through or functioning through such System Federations, Railway Employes' Department, are the duly designated and authorized representatives, for the purposes of the Railway Labor Act, of the shop employees of the plaintiffs who are members of such affiliated unions (Tr. 547; DX 31), and has interpreted such certifications to require the plaintiffs to bargain and make agreements, pursuant to the provisions of the Railway Labor Act, with such System Federations, Railway Employes' Department, and to require the representative authority existing in the individual component affiliated unions to be exercised only through such System Federations, Railway Employes' Department (DX 10). Representation rights among shop employees of the plaintiffs established through carrier recognition and not covered by certifications of the National Mediation Board are identical with those established through such certifications. (Tr. 544–545)

10. The Constitution and By-Laws of the Railway Employes' Department provide for the handling of concerted wage and agreement negotiations with the plaintiffs by the Department (PX 12, pp. 21–22), and further provide that

"No organization having once agreed to a concerted program shall have the right to withdraw from said program." (PX 12, p. 22)

"Committees, party to a concerted program under the provisions of this Article, shall have full power to conduct negotiations to a conclusion." (PX 12, p. 22)

"The Executive Council shall at any time have authority to settle or terminate any strike." (PX 12, p. 26)

"No individual system craft organization on a railway system where a System Federation is organized shall, without the consent of the President and Executive Council of the Department, negotiate a separate craft agreement with the management of the railway, but all such crafts shall be a party to the System Federation agreement negotiations." (PX 12, p. 36)

"No one except the President and Executive Council of the Department shall undertake to invoke the services of the National Mediation

Board, or to enter into an arbitration affecting any of the organizations, or members thereof composing this Department." (PX 12, p. 37)

"The Executive Board shall be the conference committee and shall have the authority to represent the System Federation, system craft organizations and members thereof in all negotiations with the management of the railway over which the System Federation has jurisdiction when the negotiations are of a system character." (PX 12, p. 34)

"It is the obligation of the officers of the Department, every National, International and Brotherhood Organization and System Federation affiliated therewith to comply with the provisions of this Constitution and the decisions of the officers and Executive Council in conformity therewith and they shall refrain from any conduct which interferes with the performance by the Department or any of its subordinate bodies of their obligations under law or contract or any conduct which defeats or subverts the lawfully declared or established policies or objectives of the Department * *" (PX 12, p. 28)

11. In May of 1963, the Executive Council of the Railway Employes' Department, pursuant to the provisions of Article VIII of the Constitution and By-Laws of the Railway Employes' Department, inaugurated a joint national movement to revise the provisions of existing agreements between the plaintiffs and the System Federations, Railway Employes' Department, relating to the wages and rates of pay of the shop employees of the plaintiffs represented for purposes of collective bargaining by the Railway Employes' Department, as aforesaid. (Tr. 182–183; PX 11, pp. 21–22; DX 14)

12. On or about May 31, 1963, pursuant to instructions from the President and Executive Council of the Department, uniform notices were served by the System Federations on the plaintiff railroads, as provided in Section 6 of the Railway Labor Act (45 U.S.C.A. § 156), proposing uniform increases in the rates of pay of plaintiffs' shop employees. (Tr. 182–183; PX 3, pp. 93–114; DX 14)

13. Negotiations and bargaining on the individual railroad properties of the plaintiffs, following the service of the Section 6 notices of May 31, 1963, were between representatives of such railroads and the executive boards of the respective System Federations, pursuant to and as provided in Article VIII of the Constitution of the Railway Employees' Department and the By-Laws of such System Federations (Tr. 240–241; PX 11; PX 150, p. 16; PX 151, p. 14); but when no agreement was reached in such system negotiations the dispute was referred by the System Federations, as directed by the Railway Employees' Department, to the President and Executive Council of the Department to negotiate the subject matter of the dispute to a conclusion in accordance with the procedures of the Railway Labor Act with the Carriers' National Conference Committee. (Tr. 184–187, 720–721; PX 3; PX 93–114; DX 11 and 12, pp. 21, 22, 26, 34, 36, 37; DX 14)

14. Negotiations were thereafter had by and between the Carriers' National Conference Committee, representing the plaintiffs, and the President and the Executive Council of the Railway Employees' Department, acting as an Employees' Conference Committee, representing plaintiffs' shop employees, but no agreement was reached, and on January 15, 1964, the Railway Employees' Department by and through its President invoked the services of the National Mediation Board under the provisions of Section 5, First, of the Railway Labor Act (45 U.S.C.A. § 155, First). (Tr. 178, 190, 191; DX 3)

15. No agreement was reached in mediation and on August 18, 1964, after the Railway Employees' Department had rejected a proffer of arbitration by the National Mediation Board made pur-

suant to Section 5 of the Railway Labor Act (45 U.S.C.A. § 155), the President of the United States created an emergency board pursuant to Section 10 of said Act (45 U.S.C.A. § 160) to investigate the dispute, and said emergency board made its report and recommendations to the President on October 20, 1964. (DX 9)

16. The plaintiffs through their National Conference Committee accepted the recommendations of the emergency board for the settlement of the dispute, but on November 12, 1964, the Executive Council of the Railway Employes' Department voted to reject such recommendations, and on the following day issued a strike call to all of plaintiffs' employees represented by the Department announcing the time and date of strike as follow: "Acting pursuant to the constitutions and laws of our respective organizations, operating through the Railway Employes' Department, AFL-CIO, and with the approval of the Executive Council and the President of the Railway Employes' Department, AFL-CIO, a strike is hereby called on the carriers listed in the appendix attached hereto to begin at 6:00 a. m. local time on November 23, 1964 unless a satisfactory agreement on our wage dispute is reached prior to that time." (Tr. 730–733; DX 10)

17. On November 21, 1964, a majority of the members of the Executive Council of the Railway Employes' Department requested the Carriers' National Conference Committee to enter into an agreement for and on behalf of the plaintiff railroads with the shop employees of the plaintiffs belonging to the crafts of blacksmiths, boilermakers, carmen and firemen and oilers and other members of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, the Brotherhood Railway Carmen of America, and the International Brotherhood of Firemen, Oilers, Helpers, Round House and Railway Shop Laborers, employed by plaintiffs, in settlement of the aforesaid wage dispute on the terms recommended by the emergency board. The Court observes that there was a "majority" only because the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers has two Executive Council votes. An agreement, as requested by said members of the Executive Council of the Railway Employes' Department, was made and entered into by the parties aforesaid in behalf of the said employees of the plaintiffs at or about noon of that day. (Tr. 288–290; DX 11) However, the agreement, which was not approved or signed by Michael Fox on behalf of Railroad Employes' Department cannot be considered to be the action of that organization but must be considered to be the action only of the individual unions and parties signatory thereto.

18. Immediately following the execution of said agreement the aforesaid members of the Executive Council of the Railway Employes' Department (who were, in fact, the chief officers, respectively, of the three unions, parties thereto) notified the officers and members of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, the Brotherhood Railway Carmen of America, and the International Brotherhood of Firemen, Oilers, Helpers, Round House and Railway Shop Laborers to disregard the strike call of the Railway Employes' Department dated November 13, 1964, and that insofar as they were concerned, the strike which had previously been authorized by the Railway Employes' Department was called off. (Tr. 290) The notification, however, was not joined in by Michael Fox for the Railroad Employes' Department and was not action taken by that organization.

19. During the afternoon of November 21, 1964, the defendants Thomas Ramsey, Joseph W. Ramsey and John W. O'Brien, each acting in behalf of one of the individual defendant unions (the International Brotherhood of Electrical Workers, the International Association of Machinists and the Sheet Metal Workers' International Association, respec-

tively) and not for or on behalf of or through the Railway Employes' Department, submitted to a member of the National Mediation Board a proposal or demand for increases in the rates of pay of the members of the aforesaid unions (Tr. 159–173, 181–182, 274–282; Court's Exhibit 1); however, the said proposal or demand was never formally presented to the Carriers' National Conference Committee or to the plaintiff railroads until tendered in open court during the hearings in this case by counsel for the defendants on December 15, 1964 (Tr. 274–282, 871–872).

20. Said agreement of November 21, 1964, was executed by plaintiff and by Boilermakers and Blacksmiths, Carmen and Firemen and Oilers under the auspices of the National Mediation Board. It was approved by J. E. Wolfe, Chairman of the National Railway Labor Conference and was witnessed by a member and mediator of the National Mediation Board.

21. Immediately after entering into the agreement with the Boilermakers and Blacksmiths, Carmen and Firemen and Oilers, the carriers, on November 21, 1964, filed an injunction suit to restrain the remaining organizations, namely, the IAM, IBEW and the Sheet Metal Workers, from carrying out the strike called for November 23. This action, entitled, Akron, Canton & Youngstown Railroad Company, et al., v. International Brotherhood of Electrical Workers, et al., No. 64 C 2054, was filed in the United States District Court for the Northern District of Illinois, Eastern Division. (To avoid confusion of the foregoing case with the case at bar, the foregoing case will be referred to as the first Akron case.) A hearing was held that afternoon on the carriers' motion for a temporary restraining order.

22. During the time that the hearing was being held in the United States District Court with respect to the first Akron case, the defendant organizations were meeting with the mediator and submitted to him a proposal for settlement of the wage issues involved. The proposal offered to settle the wage requests of the three organizations for wage increases was less than those requested in the Section 6 notices which had been served by the organizations on May 31, 1963.

23. Following the Court hearing of November 21, 1964 the Secretary of Labor, W. Willard Wirtz, requested the defendant labor organizations to postpone the strike and offered to use his best offices to facilitate collective bargaining between the parties on the wage issues (Def. Ex. 42, Tr. 845–8). That same day the strike was postponed by defendant labor organizations and the first Akron case was dismissed by the Court on plaintiffs' motion without prejudice. On November 30, 1964, and thereafter, pursuant to the request of the Secretary of Labor and the National Mediation Board (Def. Ex. 44; Tr. 851–61), the representatives of the carriers and the chief principal officers of IAM, IBEW and Sheet Metal Workers resumed collective bargaining negotiations with respect to the organizations' Section 6 notices of May 31, 1963, the report of Emergency Board 161 and the proposal for settlement submitted by these three organizations to the mediator on November 21, 1964.

24. Negotiations continued until December 7, 1964, at which time, failing to reach agreement, negotiations were suspended. The organization defendants had previously promised the Secretary of Labor that no strike would be called without at least 72 hours advance notice thereof to the Secretary. In compliance with this promise, defendant organizations, on December 8, 1964 sent a telegram to the Secretary of Labor stating that a strike was being called for 6:00 a. m. on December 15, 1964, more than 72 hours after the sending of the telegram of December 8 (Def. Ex. 12). At the same time, the defendant organizations advised their general chairmen of the new strike date (Def. Ex. 13).

25. This action was filed on December 8, 1964, the same date the telegram was sent. The plaintiffs again advanced the

contention that the three defendant labor organizations are not representatives of the employees for collective bargaining purposes and that hence the proposed strike was illegal.

26. After entry of the temporary restraining order on December 14th had been entered, restraining a strike until December 24th, 1964, defendant organizations, through their counsel, informed the Court and publicly announced that no strike would be called until after January 1, 1965.

27. Prior to the filing of this litigation and at all relevant times, the plaintiffs, as well as the defendant labor organizations and the National Mediation Board, the agency charged by law (R. L.A., § 2, ninth) with certifying the employees' representatives (when there is a dispute among a carrier's employees as to representation), have always treated the defendant labor organizations as the duly designated, certified and acting representatives of the employees in their respective crafts or classes of machinists, electricians and sheet metal workers, as shown by the following acts, among others:

(1) Numerous individual railroads who are plaintiffs herein have entered into agreements relating to rates of pay, rules and working conditions, with one or more of the labor organizations (including defendants) which are affiliated with the R.E.D. and as to which neither the R.E.D. nor any system federation is a signatory. Many of these agreements were made in the past few years and one agreement was made as recently as December 1, 1964 (Def. Ex. 32).

(2) Virtually all of the plaintiffs entered into a national agreement in June, 1953 with one of the labor organizations (Carmen) affiliated with the R.E.D., as to which the R.E.D. was not a signatory (Def. Ex. 22).

(3) Virtually all of the plaintiffs have entered into union shop agreements with defendants and other railway labor organizations (Tr. 661; Def. Ex. 39). Section 2, Eleventh of the Railway Labor Act permits a carrier to enter into such agreements only with "labor organizations duly designated and authorized to represent employees in accordance with the requirements of this Act * * *." The Union shop agreements are administered by the individual unions and the R.E.D. plays no role respecting them (Tr. 682–4; Def. Ex. 40).

(4) All labor members of the Second Division of the National Railroad Adjustment Board have been designated by the labor organizations affiliated with the R.E.D., including defendant unions. No member has ever been selected or appointed by the R.E.D. (Tr. 686–91). Under § 3(a) (h) the labor members of the Second Division may be selected only by "such labor organizations of the employees, national in scope, as have been or may be organized in accordance with * * § 2 of (the Railway Labor) Act."

(5) In its 29th Annual Report for the year ending June 30, 1963, and in prior reports, the National Mediation Board states that on about 100 selected rail carriers (including most of the plaintiffs), the shop craft employees are represented, respectively, by the IAM, Boilermakers-Blacksmiths, Sheet Metal Workers, IBEW, Carmen and Firemen and Oilers (Def. Ex. 33, pp. 91–93; Tr. 621–5, 628–35).

28. Plaintiffs, defendants and the National Mediation Board in the course of the dispute giving rise to this litigation, recognized in the following respects, the three defendant labor organizations as the representatives of their employees for collective bargaining purposes:

(a) The Section 6 notices of May 31, 1963, which initiated this dispute were served on the individual carriers on behalf of the employees represented by the individual organizations. A typi-

cal Section 6 notice so served reads as follows:

" NOTICE May 31, 1963

"Mr.————
(Title)
————
(Carrier)
————
(Address)

"Dear Sir:

"Please consider this letter as the usual and customary thirty-day notice under the Railway Labor Act, as amended, of our desire to revise and supplement all existing agreements to effectuate the provisions set forth in Wage Proposal attached hereto, such provisions to be effective June 30, 1963.

"It is our desire that conferences on this notice be held at the earliest practicable date and in any event prior to June 30, 1963, and that you, within ten days after receipt of this notice, suggest a date, time and place for this conference. In the event that we are unable to reach an agreement upon the foregoing request at such separate system conferences, we further propose that the matter be handled on a joint basis with other carriers which are receiving like notices.

"On the assumption that an agreement may not be reached in system conferences, our System Federation has joined with other System Federations serving a like notice upon other carrier managements, in the creation of an Employes' Conference Committee composed of the President and the Executive Council Members of the Railway Employes' Department, AFL-CIO.

"'In the event an agreement is not reached in our separate system conferences, we request that you join with other carrier managements who are receiving a like notice, in the creation of a Carriers' National Conference Committee which will be authorized, like our Employes' Conference Committee, to negotiate to a conclusion in accordance with the procedures of the Railway Labor Act, as amended, the subject matter of this notice.

"This request, is separate from and in addition to any other requests we have submitted to you and which are now pending.

"This notice is served in behalf of the employes of the ————— (Name of Carrier) represented by the following organizations:

1. International Association of Machinists
2. International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers
3. Sheet Metal Workers' International Association
4. International Brotherhood of Electrical Workers
5. Brotherhood Railway Carmen of America
6. International Brotherhood of Firemen, Oilers, Helpers, Roundhouse and Railway Shop Laborers

comprising System Federation No. ————— of the Railway Employes' Department of the American Federation of Labor and Congress of Industrial Organizations.

Very truly yours,"

(Def. Ex. 1)

(b) The form of authorization by which the various carrier plaintiffs to this proceeding authorized the various Carrier Conference Committees to represent them in the handling of the dispute initiated by the employees' Section 6 notice of May 31, 1963 describes the employees' representatives as follows:

"In connection with notices dated May 31, 1963, served upon various individual Western railroads by the General Chairmen, or other recognized representatives of the organizations listed below, requesting that existing agreements be amended in accordance with proposals set forth in appendices thereto—

1. International Association of Machinists

2. International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and and Helpers

3. Sheet Metal Workers' International Association

4. International Brotherhood of Electrical Workers

5. Brotherhood Railway Carmen of America

6. International Brotherhood of Firemen, Oilers, Helpers, Roundhouse and Railway Shop Laborers * * *."

(Def. Ex. 16; Tr. p. 348.)

The carrier form of authorization provides also that it is "applicable to employees represented by the organizations listed below." The organizations then are listed and include the International Association of Machinists, the Sheet Metal Workers' International Association and the International Brotherhood of Electrical Workers (Def. Ex. 16, p. 2).

(c) Plaintiff carriers represented to Emergency Board 161 (which Board considered and handled this dispute) that the three defendant labor unions were the representatives of the employees of the carriers in the craft and class of machinists, electricians and sheet metal workers (Def. Ex. 17, pp. 14, 32–42; Def. Ex. 35, pp. 10–12; Def. Ex. 36, pp. 1–3; Def. Ex. 34, pp. 8, 16–18; Def. Ex. 37, pp. 3–6).

(d) Based upon the carriers' representations to Emergency Board 161, said Board stated that the parties to the dispute included the defendant labor unions (Def. Ex. 9, pp. 6, 43).

(e) By letter dated November 20, 1964 (Def. Ex. 21) and by express agreement dated November 21, 1964 (Def. Ex. 11) the plaintiff carriers recognized that three of the shopcraft organizations affiliated with and operating through the R.E.D., namely the Brotherhood Railway Carmen of America, the International Brotherhood of Firemen and Oilers, and the International Brotherhood of Boilermakers and Blacksmiths were the bargaining representatives of the employees in the respective crafts or classes of carmen, firemen and oilers and boilermakers and blacksmiths.

(f) The agreement of November 21, 1964 is captioned: "Mediation Agreement" and recites that it is

"* * * made * * * by and between the participating carriers * * * and the employees * * * represented by the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, the Brotherhood Railway Carmen of America and the International Brotherhood of Firemen, Oilers, Helpers, Roundhouse and Railway Shop Laborers signatory hereto * * *." (Def. Ex. 11, p. 1.)

Said agreement was executed for and on behalf of the plaintiffs by their respective conference committees and for the employees by the Presidents of the respective international organizations (Ibid, p. 8). The agreement of November 21, 1964 was made under the auspices of the National Mediation Board and was witnessed by a member of the National Mediation Board and a mediator for the National Mediation Board (Ibid, p. 9).

The R.E.D. did not execute the agreement of November 21, 1964 and had nothing to do with the negotiating or executing of said agreement (Tr., 11/21/64, pp. 79–82 (Fox); p. 110 (Wolfe)). The carriers consider themselves bound by the agreement of November 21 even though the R.E.D. was not a signatory thereto (Tr. pp. 425–26).

(g) Within hours after executing the agreement of November 21, the plaintiffs on November 21, 1964, filed the first Akron case. The first Akron suit for the first time during the dispute giving rise to this litigation, advanced the contention that the three defendant labor organizations are not the representatives of the employees for collective bargaining purposes and that hence the proposed strike by them was illegal. The com-

plaint, however, (par. 7), alleges that named individuals are representatives of classes of plaintiffs' employees "for which the three defendant labor organizations [the 3 labor organizations which are defendants here] hold representation rights." Immediately preceding the filing of the First Akron action, however, plaintiffs sought to invoke the services of the National Mediation Board with respect to an alleged new labor dispute between it and the three defendant labor organizations (P. Ex. 5).

(h) Immediately after the execution of the agreement of November 21, 1964, the three labor organizations parties thereto cancelled the proposed strike by their members (Tr. 290).

(i) Pursuant to the request of the Secretary of Labor to each of the respective chief officers of the defendant labor organizations, the defendant unions postponed the strike as to their respective members in order to resume further mediation and negotiation with the plaintiffs, the Secretary of Labor and the National Mediation Board. At no time did plaintiffs challenge the authority or power of the respective defendant labor organizations to postpone the strike by their respective members.

(j) Between November 30, 1964 and December 7, 1964, under the auspices of the Secretary of Labor and the National Mediation Board, the plaintiffs by their designated representatives, and the defendant labor unions, by their chief international officers met in Washington, D. C. The parties met together on two occasions during that period and numerous meetings were held by the parties separately with the Secretary of Labor and one or more members of the National Mediation Board in an attempt to mediate, negotiate and settle this dispute (Tr. O'Brien, pp. 179, 261–9; Wolfe, pp. 273–81, Ramsey pp. 850–61; Def. Ex. 44; Def. Ex. 13).

29. Defendant labor organizations and R.E.D. have complied with their respective constitutions and by-laws in relation to the serving and progressing of the Section 6 notices of May 31, 1963.

30. The defendant labor organizations have exhausted all of the procedures of the Railway Labor Act and are free to withdraw from work.

31. A review of the record in this case discloses that at no time did the Railway Employes' Department, acting through Michael Fox, President, and the six union officials, all of whom signed the strike call on November 13, 1964 (fixing the time for a strike at 6:00 o'clock A.M. on November 23, 1964) ever jointly or severally sign any withdrawal or cancellation of the strike.

32. The plaintiffs in this case comprise substantially all of the railroad systems of the United States, carrying mail, passengers, defense material, and personnel for the Government and serving the millions who comprise the shipping and travelling public. A work stoppage could and would cause inestimable damage to the national economy, and the Court specifically finds that a very real emergency exists.

## CONCLUSIONS OF LAW AS TO COUNT I

1. The cause of action asserted by the plaintiffs arises under the Railway Labor Act, as amended (45 U.S.C.A. § 151 et seq.), and the amount in controversy exceeds the sum of $10,000, exclusive of interest and costs. The jurisdiction of this court derives from the Act of June 25, 1948, as amended by the Act of July 25, 1958 (28 U.S.C.A. § 1331); from the Act of June 25, 1948 (28 U.S.C.A. § 1337), and from the Act of June 1, 1947 (29 U.S.C.A. § 158). Venue is properly laid in this court.

2. The processes of the Railway Labor Act have been exhausted and the parties are free to resort to self-help. (Brotherhood of Locomotive Engineers v. Baltimore and Ohio R. R. Co., 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963); The Order of Railroad Telegraphers v. Chicago and North Western R. R., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed. 2d 774 (1960)).

3. The evidence introduced in this case has failed to sustain the position of the plaintiffs.

■ 4. Although none of the defendant labor organizations have been designated or authorized by the National Mediation Board to represent any of the employees of the plaintiff railroads, in practice the plaintiffs, defendants and the National Mediation Board have so treated them and plaintiffs are precluded from challenging their designation as representative.

■ 5. The Railway Employes' Department is a voluntary association consisting of the six autonomous shopcraft unions including defendant organizations. It has no power to make agreements for any of its constituent organizations except as such power is given to it expressly by each organization.

■ 6. Plaintiffs, by their conduct in entering into the agreement of November 21, 1964, with Carmen, Firemen and Oilers and Boilermakers and Blacksmiths have recognized that each of the six labor organizations affiliated with R.E.D. is the representative of its respective craft or class of employees, and plaintiffs have waived any right to question such status and are estopped from so doing.

■ 7. Defendant labor organizations and R.E.D. have complied with their respective constitutions and by-laws in relation to the serving and progressing of the Section 6 notices of May 31, 1963. Even if some provisions of such constitutions or by-laws have not been complied with, plaintiffs have no standing to seek injunctive or other relief for such non-compliance in this action. (Pullman Co. v. Order of Railway Conductors and Brakemen, 316 F.2d 556 (C.A.7, 1963); American Live Stock Commission v. Chicago Livestock Exchange, 143 Ill. 210, 233, 32 N.E. 274, 18 L.R.A. 190 (1892); Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962)).

8. The injunction prayed for by plaintiffs should be denied.

## FINDINGS OF FACT AS TO COUNT II

1–8. The court adopts as its findings herein numbered 1 through 8, both inclusive, the findings numbered 1 through 8, both inclusive, set forth as to Count I.

9. International Brotherhood of Electrical Workers (IBEW); International Association of Machinists (IAM); and Sheet Metal Workers' International Association (Sheet Metal Workers), defendants herein, together with the following unincorporated labor organizations: International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers (Boilermakers and Blacksmiths); Brotherhood of Railway Carmen of America (Carmen); and International Brotherhood of Firemen, Oilers, Helpers, Roundhouse and Railway Shop Laborers (Firemen and Oilers) are autonomous labor organizations affiliated with and operating through the Railway Employes' Department.

10. On or about May 31, 1963, Boilermakers and Blacksmiths, Carmen, IBEW, IAM, Sheet Metal Workers and Firemen and Oilers, pursuant to Section 6 of the Railway Labor Act, served notices on all plaintiff-carriers in the United States with which they have agreements, of their desire for an increase in wages in accordance with a wage proposal attached thereto. (Def. Ex. 1)

The wage proposal was as follows:

"1. Initial Wage Increase. Increase all rates of pay for employees covered by this agreement in the amount of 10% plus 14¢ per hour, effective June 30, 1963, applied so as to give effect to this increase in pay irrespective of the method of payment.

"2. Subsequent Wage Increases. Increase all rates of pay for employees covered by the agreement in the amount of 3½% per year, to be effective at the midpoint of each twelve months period beginning with the effective date of this agreement.

"3. Cost-of-Living Adjustment. Wage rates established in accordance with paragraphs 1 and 2 above shall be subject to a cost-of-living adjustment, effective on each November 1 and May 1. Such cost-of-living adjustment shall be proportionate to the change in the Consumer Price Index for the months of September and March respectively, above the base figure of 106, (1957–59=100) excepting that it shall not operate to reduce wage rates below those established in paragraphs 1 and 2 above."

11. Subsequently, in June and July, 1963, counterproposals were served by all such carriers on the six organizations proposing certain changes in their agreements with these organizations. These proposals were purported to be served pursuant to the Railway Labor Act. Defendants' Exhibit 2 is a typical counterproposal.

12. Subsequently, the six labor organizations and the plaintiffs endeavored to resolve the dispute as more fully stated in the Findings as to Count I. The dispute was considered by Emergency Board 161, which rendered its report on October 20, 1964.

13. IAM, IBEW and Sheet Metal Workers have complied with all procedures available under the Railway Labor Act for the resolution of the dispute with plaintiffs.

14. The report of Emergency Board 161 was rendered together with the reports of Emergency Boards 162 and 163. The report recommended a wage increase of 9¢ per hour each year for three years effective January 1, 1964 (Def. Ex. 9, p. 14). This recommendation embraced the six labor organizations affiliated with R.E.D. (the shop crafts) and a number of other labor organizations.

15. The shop crafts had informed Emergency Board 161 that it wished the employees to receive wage increases expressed in percentage terms rather than in terms of cents per hour so that higher paid employees would receive a larger increase than lower paid employees. Plaintiffs indicated their willingness to go along with the different organizations on the distribution of the increases so long as the amounts were comparable. The Board stated (Def. Ex. 9, p. 15):

"The figure of nine cents an hour increase each year should be across the board for the Organizations which prefer not to have a differential treatment among their members (those other than the shop crafts), and should be in percentage terms for the shop crafts, which prefer it that way so as to recognize the special problem of their skilled craftsmen whose rates are low compared to those in outside industries.

"This is happily one area in which there seems to be no basic disagreement between the parties. The Carriers have indicated their willingness to go along with the different Organizations on the distribution of the increases, so long as the amounts are comparable."

16. Following the Emergency Board report, the parties met for the purpose of negotiating an agreement. Those efforts were fruitless and on November 13, 1964 the six organizations acting through R.E.D. issued a strike call (Def. Ex. 10), for November 23, 1964 at 6:00 a. m. local time.

17. On November 21, 1964, the plaintiffs and the Boilermakers and Blacksmiths, Carmen and Firemen and Oilers entered into an agreement disposing of the Section 6 notices served on behalf of those organizations and the counterproposals previously referred to (Def. Ex. 11). With respect to wages said agreement provided for a cents per hour rather than a percentage wage increase. These terms were not acceptable to IBEW, IAM and Sheet Metal Workers and they were not parties to the agreement. The defendant labor organizations requested higher wage and percentage wage increases. All increases requested, however, were less than those originally proposed in the Section 6 no-

tices of May 31, 1963. (Court Ex. 1; Tr. 457–468, 838–45, 877–80)

18. Immediately after entering into the agreement with the Boilermakers and Blacksmiths, Carmen and Firemen and Oilers, the carriers, on November 21, 1964, filed an injunction suit to restrain the remaining organizations, namely, the IAM, IBEW and the Sheet Metal Workers, from carrying out the strike called for November 23. This action, entitled, Akron, Canton & Youngstown Railroad Company, et al., v. International Brotherhood of Electrical Workers, et al., No. 64 C 2054, was filed in the United States District Court for the Northern District of Illinois, Eastern Division. (To avoid confusion of the foregoing case with the case at bar, the foregoing case will be referred to as the first Akron case.) A hearing was held that afternoon on the carriers' motion for a temporary restraining order.

19. During the time that the hearing was being held in the United States District Court with respect to the first Akron case, the defendant organizations were meeting with the mediator and submitted to him a revised proposal for settlement of the wage issues involved. (Court Ex. 1) The proposal offered to settle the wage requests of the three organizations for wage increases less than those requested in the Section 6 notices which had been served by the organizations on May 31, 1963.

20. At no time have the defendant labor organizations ever requested wage increases in excess of those originally proposed in their notices of May 31, 1964. By insisting in part on a percentage wage increase so as to increase the existing differential between the skilled and less skilled employees in their respective crafts and classes, the defendant labor organizations have not sought anything different from their original Section 6 notices.

## CONCLUSIONS OF LAW AS TO COUNT II

1–7. The court adopts as its conclusions herein numbered 1 through 7, both

inclusive, the conclusions of law numbered 1 through 7, both inclusive, set forth as to Count I.

■ 8. The defendant labor organizations' proposals to settle their dispute with plaintiffs has been at all relevant times and now is within the scope of their original Section 6 notices. By insisting in part on a percentage wage increase so as to increase the existing differential between the skilled and less skilled employees they represent, the defendant labor organizations have not sought anything different from their original Section 6 notices or different from the recommendations of Emergency Board 161.

■ 9. Even if the defendant labor organizations were proffering a new solution to the problems generated by the original Section 6 notices, the Railway Labor Act does not require them to serve a new Section 6 notice. A contrary rule would foster inflexible attitudes, stultify the process of free collective bargaining and be incompatible with the spirit of the Railway Labor Act. (Pullman Co. v. Order of Railway Conductors and Brakemen, 316 F.2d 556 (C.A.7, 1963)

■ 10. The injunction prayed for by the plaintiffs should be denied.