The **PULLMAN COMPANY**, Plaintiff-Appellee,

v.

**ORDER OF RAILWAY CONDUCTORS AND BRAKEMEN, A. G. Wise and G. H. Harris, Defendants-Appellants.**

No. 13844.

United States Court of Appeals Seventh Circuit.

April 10, 1963.

Rehearing Denied En Banc May 20, 1963.

Burke Williamson, Chicago, Ill., Harry Wilmarth, Cedar Rapids, Iowa, Jack A. Williamson, Chicago, Ill., Shuttleworth & Ingersoll, Cedar Rapids, Iowa, for defendants-appellants.

Howard P. Robinson, Herbert S. Anderson, Chicago, Ill., Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel. Robert Diller, Martin M. Lucente, Wm. M. McGovern, Jr., Chicago, Ill., for plaintiff-appellee.

Before SCHNACKENBERG, CASTLE and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

The action instituted below was for an injunction to enjoin a planned strike of the conductor-employees of plaintiff, The Pullman Company. The defendants include the Order of Railway Conductors and Brakemen and two officers of that labor organization.

A temporary restraining order was granted pending a trial on the merits which occurred on April 18, 1962. The trial judge, on April 23, 1962, entered findings of fact, conclusions of law, and a final decree enjoining the strike. This appeal therefrom followed.

■ The injunction was granted on the ground that the conductors' organization had violated the Railway Labor Act, 45 U.S.C. § 151 et seq. It is clear that the District Court lacked jurisdiction to grant an injunction in this labor dispute, Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., unless a clear violation of the Railway Labor Act was shown. Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

The common stock of The Pullman Company is owned by fifty-three railroads that acquired its capital stock in 1947, following a decree of a federal district court in Philadelphia requiring Pullman, Inc. to divest itself of its sleeping car business.

The Pullman Company as it presently exists under railroad ownership is a service enterprise. Under its Uniform Service Contract with the railroads it serves, Pullman must offer its services as an innkeeper of hotels on wheels to any railroad which desires its service. Upon notice, any railroad can discontinue its service requirements; furthermore, each railroad has the right at any time to take over the operation of sleeping cars from Pullman.

The instant dispute revolves around the right of the railroads to discontinue their relations with Pullman on short notice and the disruptive effect this may have on the employees of Pullman represented by the conductors' organization. While other issues are collaterally in-

volved in the dispute between Pullman and the organization, it is sufficient for our purpose to focus on this aspect of the dispute because it appears from the District Court's decision that the injunction was granted on the grounds: (1) the organization failed to exhaust the provisions of the Railway Labor Act as respects the formal notice requirements of Section 6 of the Act, 45 U.S.C. § 156; (2) the mediation efforts of the National Mediation Board as required by 45 U.S.C. § 155 had not been terminated as of the date of the proposed strike; (3) the organization had failed to obtain a proper strike ballot vote from its membership regarding the proposed strike; and (4) the "Joint Proposal" made to Pullman by the defendants related to intercorporate arrangements and hence was not "a proper subject of collective bargaining" under the Railway Labor Act.

On February 27, 1959, the organization served a Section 6 notice on Pullman, proposing wage increases. On March 30, 1959, Pullman served a notice on the organization proposing modification of rules governing working conditions. The organization filed its own notice for changes in rules governing working conditions on April 24, 1959; this notice related to consolidation of seniority rosters.

Negotiations between the parties were conducted but no agreement was reached. On September 22, 1959, the organization submitted a strike ballot to its members who voted to authorize a strike.

On November 7, 1960, after the strike ballot just mentioned, the organization served another Section 6 notice on the company proposing job protection and other rules for Pullman conductors.[1] An examination of the Section 6 notices shows that the one dated November 7, 1960, contains the matters at issue in this case.

With the assistance of the National Mediation Board, a mediation agreement was executed between the organization and Pullman on November 18, 1960, which resolved the wage issue between the parties. The mediation agreement continued the other issues raised by the Section 6 notices (including those raised by the notice of November 7, 1960) under the jurisdiction of the National Mediation Board. The agreement permitted the service of additional Section 6 notices by the company as counterproposals to the organization's notices. On December 5, 1960, the company served a

---

1. The proposed rule changes in the Section 6 notice read:

"No conductor of The Pullman Company subject to this Agreement shall be furloughed, dismissed or placed in a worse condition with respect to his rates of pay, rules or working conditions in anticipation of or as a result of:

(1) The termination, cancellation or modification of any contract between The Pullman Company and any other common carrier by railroad, which now exists or which may hereafter be consummated covering any services or work customarily performed by Pullman conductors in connection with the operation of parlor cars or sleeping cars owned by or leased to The Pullman Company, or

(2) The abandonment, transfer, consolidation or merger of any other common carrier by railroad that affects the operation of sleeping or parlor cars owned by or leased to The Pullman Company."

The means proposed to implement the above job-protection arrangement were set out by the organization in the same Section 6 notice:

"It is further agreed that if the number of positions of conductors are reduced by the actions enumerated in points 1 and 2, provisions shall be made to establish a like number of positions within the scope of the Agreement between The Pullman Company and its Conductors, equal to those abolished on the remainder of the sleeping and parlor car operations. The method of filling such positions and the procedure to be followed in connection therewith shall be determined by agreement with the duly designated representatives of the conductors.

"It is further understood and agreed that if for any reason the position of a Pullman car conductor is discontinued hereafter and no other Pullman conductor position is available to such conductor, or the conductor affected under the scope of the Agreement, then in such event the Washington Job Protection Agreement (Agreement of May, 1936, Washington, D. C.) shall be construed as applicable and its benefits shall be granted to the conductor or conductors who are deprived of employment."

Section 6 notice on the organization proposing the compulsory retirement of Pullman conductors at age sixty-six on and after January 1, 1962, and at age sixty-five on and after January 1, 1963.

The National Mediation Board terminated its services on August 4, 1961, and a strike was called for September 4, 1961.

All of the issues not settled by the mediation agreement were submitted to an Emergency Board appointed by the President of the United States on September 1, 1961, pursuant to Section 10 of the Railway Labor Act.

The Emergency Board reported to the President on December 11, 1961. The Board listed twenty-five issues in dispute that were yet unresolved. The Board's discussion in its report of the issue of "Job Stabilization and Severance Allowance" is pertinent to our discussion.[2]

2. "1. Job Stabilization and Severance Allowance
(Issue No. 24; New Rule.)

"There is no rule in the current Agreement covering loss of jobs by conductors. The Organization has proposed a new rule which provides in effect that no conductor shall be furloughed, dismissed, or placed in a worse condition with respect to his rate of pay, rules or working conditions, because of the termination, cancellation or modification of any contract between the Pullman Company and any railroad, or because of the merger, consolidation, transfer or abandonment of any railroad. It provides that if the number of positions are reduced as a result of any of the actions specified above, the Company is obligated to establish a like number of positions on the remaining operations. The proposed rule further provides that if for any reason the position of a Pullman conductor is discontinued and no other conductor position is available, then the displaced conductor shall be entitled to the benefits of the Washington Job Protection Agreement of 1936.

"In essence, there are two principal features of this proposal: a job freeze, and a severance pay plan.

"As for the job freeze, the proposal as interpreted by the Organization would require that so long as any Pullman conductor work remains in a particular seniority district, the number of Pullman conductor positions in that district would not be reduced, but in the event of a discontinuance of any conductor assignments, the remaining work would be divided among all the existing positions; and each conductor would continue to receive his full basic month's pay regardless of the amount of assigned work.

"This phase of the proposed rule would have the effect of 'freezing' conductors' jobs, whether or not there was work which warranted their existence. This is illustrated by the example used during the hearings, that if there were an eleven-man run and a three-man run in a given district and the eleven-man run were either terminated or taken over by a carrier, the remaining Pullman conductor work in the district which was previously done by three men would, under the proposed rule, be divided among the total of fourteen conductors, at full monthly pay.

"This requirement that conductors be continued in employment, regardless of how small an amount of work there may be for them to do, is extreme and does not represent a constructive approach to the problem. It will not preserve work for conductors, but is more likely to destroy the Company and all conductor work along with it. The Board must reject this part of the proposal for lack of merit.

"The severance pay feature of the Organization's proposal provides that conductors whose jobs are terminated for any of the reasons mentioned under the job freeze proposal, or for any other reason such as loss of business, and for whom no other conductor work is available under the job freeze plan, shall receive benefits similar to those provided under the Washington Job Protection Agreement of 1936 for employees who lose their positions as the result of the merger or consolidation of railroads. The idea of some form of severance benefits for employees in the railroad industry is not new. Employees adversely affected by the consolidation or merger of their railroad employers have been guaranteed such benefits since 1936 under the Washington Job Protection Agreement of that year. The area of employee job protection in the railroad industry has been extended by the Interstate Commerce Commission which has, in connection with its approval of the abandonment of service by various carriers, ordered protective measures for employees along the lines of those provided in the Washington Agreement.

"The most recent extension of the area in which the principle of employee job protection has been applied in the railroad industry is found in the agreement executed on October 29, 1961, between the South-

It is to be noted that in evaluating the organization's proposals in the Section 6 notice of November 7, 1960, the Emergency Board rejected any proposal for a

ern Pacific Company (Pacific Lines) and the Order of Railroad Telegraphers. This agreement, among other things, provides certain benefits for telegraphers who lose employment because of technical and organizational changes instituted by the Southern Pacific.

"There are two essential differences presented by the Organization's proposal for severance benefits here, and the provisions for such benefits already existing in the railroad industry, to which we have referred. In the first place, the proposal before us would provide such benefits to all conductors deprived of employment, from whatever cause. No distinction is made as to loss of work due to decline in passenger demand, as opposed to loss of work resulting from mergers, consolidations and abandonments, or takeover of service by railroads.

"Existing severance pay plans in the railroad industry provide benefits for employees who suffer loss of employment because of mergers, consolidations and abandonments. But we find no example in the industry of severance allowances to employees who lose their jobs due simply to declining railroad business. We see no reason for recommending that Pullman conductors be afforded severance pay benefits not generally available in the industry.

"The second difference is that in all of the situations in the industry in which severance benefits are not provided, the cause of the job loss to employees involved is under the control of their employer. In the instant case, while the Pullman Company is the nominal employer of Pullman conductors, it is not the Pullman Company, but its customers—the railroads —whose decisions cause the termination of conductor jobs under consideration here. Any real solution to the problem of Pullman conductors who are displaced due to mergers of railroads and takeovers by railroads of sleeping car service can only be accomplished by cooperation among all of the interested parties—the Pullman Company, the Organization and the railroad users of Pullman service. We can see no practical method or equitable justification for imposing upon the Pullman Company alone the responsibility for providing severance benefits to Pullman conductors displaced by mergers between railroads over which Pullman has no control, or by decisions of railroads to dispense with Pullman services, over which Pullman also has no control. In each of these cases, as far as Pull-

man is concerned, there is simply a loss of business to it.

"In view of the broad nature of the proposal, and the Company's lack of control over conductors' loss of employment, we do not think that the Organization's proposal as to severance benefits can be recommended as a solution of the problem to which it is directed.

"Although, for the reasons set forth above, we have concluded that the Organization's proposal should be withdrawn, we do not in any way belittle the importance and urgency of the problem which it was designed to solve. As we have indicated, the threat to Pullman conductors' employment is both real and immediate. These employees are all men with long years of service with the Pullman Company, and have attained middle age or beyond. The skills which they have acquired are unique to their occupation and are not readily usable in other fields. For these reasons they find little employment opportunity elsewhere.

"We think that in two specific sets of circumstances which we have pointed out: (1) mergers, consolidations or abandonments by railroads and (2) take-overs by railroads of sleeping car operations, some form of job protection for Pullman conductors who are adversely affected thereby, should be considered.

"The loss of jobs by Pullman conductors because of a merger, consolidation, or abandonment, presents a particularly inequitable situation. In each of these cases, all of the employees of the railroads involved would be protected by the Washington Job Agreement. The Pullman conductors, whose jobs are affected in precisely the same way and for precisely the same reasons as the jobs of the railroad employees, do not receive the protection of this Agreement. The reason for this is purely and simply because the railroads operate their sleeping car service through a separate corporate structure, the Pullman Company, which is not a party to the merger. We can see no equity in this difference in treatment of Pullman conductors who lose their jobs because of the merger, consolidation or abandonment, and of employees of the railroads involved who lose their jobs for the same reason.

"The loss of conductor jobs which may be caused by railroads taking over their sleeping cars from the Pullman Company, and operating them with railroad employees instead of Pullman conductors, is unique in the industry. Under the Uni-

"job freeze," and viewed the organization's proposal as to severance benefits as being impractical without additional groundwork being laid. The Board's suggestions along this line clearly outlined the proper direction that future negotiations between the parties should take in finding a solution to the problem of job security raised by the Section 6 notice of November 7, 1960:

> " * * * It appears to us that the railroads, the Pullman Company and the Organization, *all three must be involved.* We think that at the very least, the Pullman Company and the Organization should jointly attempt to devise some program for protection of Pullman conductors under these circumstances, which they can present to the railroads as a group, or to an individual railroad at such time as it indicates its intention to reclaim its sleeping cars. One approach, which apparently was given some thought in connection with the New York Central and which seems to us to have merit, would be to give displaced Pullman conductors some preference in filling new assistant train conductor posi-

tions which are created as the result of such take-over." (Emphasis supplied.)

The Board recommended that the *proposal* of the organization with respect to job stabilization be withdrawn.

The organization, declaring that they were attempting to comply with the suggestions of the Emergency Board, submitted on December 28, 1961, to Pullman a document intended to adapt the Washington Job Protection Agreement to the situation of Pullman conductors. On December 29, 1961, the organization presented to Pullman a letter which might be addressed jointly by Pullman and its conductors to the railroads using the services of Pullman, together with a "Joint Proposal" which Pullman and the organization might submit to the railroads. Pullman does not dispute the fact that the organization submitted various proposals, but insists that they were merely informal proposals not embodied in a Section 6 notice as required by the Railway Labor Act. Pullman agrees that the proposals fell in two areas:

> "1. Extension of the Washington Job Protection Agreement benefits to Pullman conductors adversely

---

form Service Contract, any railroad user of Pullman service may, on proper notice, terminate its use of Pullman service, reclaim the sleeping cars owned by it and operate these cars itself. The Pullman Company has no control whatsoever over the railroad's decision.

"It is difficult to relate this kind of job insecurity of Pullman conductors to that of any other group of railroad employees; although the basic cause of the job loss seems not too different from job loss due to reorganization. In any case, such a take-over, when it occurs, can result in wholesale unemployment of Pullman conductors; witness the New York Central take-over in 1958, as a result of which 122 Pullman conductors lost employment. We have already indicated that the problem is not likely to be solved by the Organization and the Pullman Company alone. Another Board has said, in the New York Central case, that the problem cannot be solved by the Organization and a particular railroad alone. It appears to us that the railroads, the Pullman Company and the Organization, all three must be

involved. We think that at the very least, the Pullman Company and the Organization should jointly attempt to devise some program for protection of Pullman conductors under these circumstances, which they can present to the railroads as a group, or to an individual railroad at such time as it indicates its intention to reclaim its sleeping cars. One approach, which apparently was given some thought in connection with the New York Central and which seems to us to have merit, would be to give displaced Pullman conductors some preference in filling new assistant train conductor positions which are created as the result of such takeover.

"We feel that the Organization and the Pullman Company, if they determine to make a thorough and sincere effort, can originate a more workable solution to the problem of greater job security for Pullman conductors than the proposal which was submitted to this Board.

"The Board recommends that the proposal of the Organization with respect to job stabilization be withdrawn."

affected by railroad mergers and abandonments;

"2. In the event of take-overs of sleeping car service, Pullman conductors to become railroad employees, carrying their jobs and seniority with them and working under the terms of their collective bargaining agreement with Pullman."

Several meetings followed, various counter-proposals were made by Pullman, and numerous letters were exchanged by the parties without agreement being reached. On April 3, 1962, the organization gave notice of a strike to begin April 12. On April 3, the National Mediation Board gave notice that it would again enter the proceedings, in the meantime requesting a further postponement of the strike. The organization agreed to continue its conferences with Pullman and the Board, but declined to postpone the strike. The instant action began on April 10. First a temporary restraining order was granted; then followed the permanent injunction.

### I.

The District Court, in its findings of fact and conclusions of law stated:

Findings of Fact—

"11. The Conductors' second proposal of December 28, 1961, was a so-called 'Joint proposal' to be signed by Pullman and the organization, and the railroad users of Pullman service * * * This Joint Proposal was not included in the Conductors' notice of November 7, 1960, or any other notices served by the organization pursuant to Section 6 of the Railway Labor Act.

Conclusions of Law—

"2. Plaintiff and defendants are both subject to the duty imposed by the Railway Labor Act to exert every reasonable effort to settle all disputes in order to avoid any interruption to commerce or to the operation of any carrier. * * *

"3. Defendants' refusal to postpone their threatened strike pending the efforts of the National Mediation Board to mediate a settlement of the dispute violated the Railway Labor Act.

* * * * * *

"6. The proposals first presented by defendants in December, 1961, raised new issues beyond the scope of any notice previously served by defendants pursuant to Section 6 of the Railway Labor Act. As to the issues now in dispute between the parties the processes of the Railway Labor Act have not been exhausted. The strike called by defendants is, therefore, illegal and should be enjoined."

We hold that these conclusions, both factual and legal, are, as a matter of law, erroneous.

◼ We believe that a Section 6 notice is adequate if it informs a party of the purpose sought to be attained by the other party with sufficient definition to enable the former to understand the implications of the notice and proposed means adapted to the goal's attainment. The fact that the course suggested for the attainment of the goal proves to be unacceptable to one of the parties, or is found impractical by a Presidential Emergency Board (as here), does not render nugatory the good-faith tender of a Section 6 notice or affect its scope.

◼ In the instant case, the Section 6 notice of November 7, 1960, adequately informed Pullman that the goal of the organization was job protection in situations arising from "the termination, cancellation or modification of any contract between The Pullman Company and any other common carrier by railroad" or "[t]he abandonment, transfer, consolidation or merger of any other common carrier by railroad that affects the operation of sleeping or parlor cars owned by or leased to The Pullman Company." Pullman was put on notice of its implications when the notice was given. Certainly, if the company was not cognizant of its implications at that time, it became so after the Emergency Board

made its recommendations. To hold that every proffer of a new solution to a problem gives rise to a right on the part of one of the bargaining parties to demand a new Section 6 notice would foster inflexible attitudes, a result not consonant with free collective bargaining or the spirit of the Railway Labor Act.

The proposals of December, 1961, only attempted to implement the suggestions of the Emergency Board. The fact that Pullman and the organization reached an impasse in negotiations on the "means" by which job protection was to be accomplished is immaterial to whether the organization violated the Railway Labor Act. If the parties complied with the bargaining requirements of the Act, the District Court had no authority to grant the injunction.

In the words of the United States Supreme Court, "The parties are required to submit to the successive procedures designed to induce agreement. § 5 First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help." Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 725, 65 S.Ct. 1282, 1291, 89 L.Ed. 1886 (1945). See also, Brotherhood of Locomotive Engineers v. Baltimore & Ohio Railroad Co., 83 S.Ct. 691.

We think it significant that at no time before this suit was started did Pullman protest to the organization or any of the government boards that the proposals in question were not covered by the November 7, 1960, Section 6 notice.

## II.

Because of our determination that the proposals of December, 1961, were within the scope of the Section 6 notice filed

on November 7, 1960, the conclusion of the District Court that the reentry of the National Mediation Board into the dispute on April 3, 1961, started a new running of the statutory thirty-day waiting period is erroneous. Only one such waiting period is required by the statute. Elgin J. & E. Ry. Co. v. Brotherhood of Railroad Trainmen, 302 F.2d 540 (7th Cir., 1962). Pan American World Airways v. Flight Eng. Intern. Assoc., 306 F.2d 840 (2nd Cir., 1962).

## III.

We do not believe that the District Court could legally inquire into the strike authority of the conductors' organization as obtained from its membership.[3] The Order of Railroad Conductors and Brakemen is the duly certified bargaining representative of the Pullman conductors under the Railway Labor Act. Whether the conductors fully complied with the rules of their organization does not warrant, in this setting, an inquiry by the court. Such would be no more justified than would be an examination into the intracorporate activities of Pullman to determine whether it followed the desires of its stockholders or board of directors or was in compliance with its corporate charter in not acceding to the organization's proposals.

## IV.

The District Court found that the proposals made by the organization in December, 1961, contemplated intercorporate bargaining between Pullman and the railroads, and hence, were unlawful. It seems to us untenable to say that the organization violated the Railway Labor Act when these proposals

3. The District Court's conclusions of law number 4 and 7 read in part:
"4. The issues now in dispute between the parties are substantially different from those submitted and voted on by the members of the Conductors' organization in September, 1959. In calling the present strike, defendants failed to follow the procedures required by the Statutes of the Order of Railway Conductors and Brakemen. Defendants' duty to exert every reasonable effort to avoid interrup-

tions to commerce requires them to obtain valid authority under their Statutes from their membership before calling a strike.
\* \* \* \* \*
"7. \* \* \* An injunction should issue enjoining defendants from striking over the proposals in dispute until \* \* \* authority obtained for a strike from the membership pursuant to the Statutes of the Order of Railway Conductors and Brakemen."

embodied the very suggestions made to the parties by the Presidential Emergency Board and when the Board had asked the organization to withdraw its previous proposal with respect to job stabilization.

To hold that the District Court was correct in branding these proposals illegal, would be to say that the Emergency Board disapproved an impractical approach to the problem and suggested an illegal alternative. The Railway Labor Act should not be interpreted so as to create that kind of contradiction.

Since we are convinced that as a matter of law there was no showing of a violation by the Order of Railroad Conductors and Brakemen of the Railway Labor Act, the Norris-LaGuardia Act prevented the District Court from issuing the injunction. The order granting it is reversed.