**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**M & M OLDSMOBILE, INC., Respondent.**

**No. 299, Docket 30852.**

United States Court of Appeals Second Circuit.

Argued Feb. 20, 1967.

Decided May 3, 1967.

Lawrence M. Joseph, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Francis Flannery, Atty., Washington, D. C., on the brief), for petitioner.

Benjamin Mandelker, New York City, for respondent.

Richard A. Weinmann, New York City (Sipser, Weinstock & Weinmann, New York City), for intervenor, Local 259, United Automobile Workers, AFL–CIO.

Before FRIENDLY, ANDERSON and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

In August 1964, after bargaining with a duly certified union,[1] respondent M & M Oldsmobile, Inc. arrived at an agreement which granted substantial economic benefits to its employees. For almost three years, M & M has refused to put the agreement into effect, claiming that it was not ratified by the employees. The National Labor Relations Board petitions to enforce its order which requires, *inter alia*, respondent to give effect to the agreement. The Board held that respondent's action was a refusal to bargain under section 8(a) (5) of the National Labor Relations Act, 29 U.S. C. § 158(a) (5). We enforce the Board's order.

The findings of the Board were as follows: In a consent election in June 1964, a majority of respondent's twenty-eight employees in the unit designated the Union as their bargaining representative. By August, respondent and the Union had come to terms, and a handwritten

---

1. The Union, an intervenor, is Local 259, United Automobile Workers, AFL–CIO.

draft of a collective bargaining agreement was signed by representatives of each. After the signing, the Union's president requested a ratification clause to satisfy the Union's internal requirements of its constitution and bylaws.[2] Respondent acceded, and this sentence was added to the agreement and initialed for all parties:

It is understood that this agreement is subject to ratification by the employees of M & M.

The first meeting called by the Union for ratification proved inconclusive; although twenty or twenty-two members attended, only twelve voted, with seven opposing the contract. At the second, seventeen employees attended; the contract and a strike were discussed as alternatives. Five or six employees were in favor of a strike, and the rest opposed. The Union president then asked if anyone was opposed to the contract. Seven men raised their hands; the president then declared that under the circumstances the contract was ratified. No employee at the time indicated any dissatisfaction with the result of the meeting or the way in which it was conducted. The Union thereupon sent a telegram to respondent advising it that the contract had been ratified and was in effect.

Later that night, respondent's president, Mr. Martin, received a telephone call from two employees, who said that a ratification meeting had been held and that eleven of the seventeen employees present had voted against ratification. Martin told them to put this in writing and see him the next day. The next morning, Martin received the Union's telegram; the letter, signed by eleven employees, also arrived. It stated that there had been a fraudulent vote count at the meeting, and asked the company not to sign the contract. Thereafter, although respondent's chief negotiator, a management consultant, advised it that the Union had a contract, respondent accepted the advice of two attorneys that the contract was not binding because it had not been ratified and notified the Union of its position. The Union denied this, and after some abortive correspondence, requested arbitration; respondent refused, on the ground that there was no contract requiring arbitration. These facts found by the examiner were later adopted by the Board; the examiner's findings rested heavily on the lack of credibility of key witnesses for respondent, who offered a different version of some significant events.

On this record, the Board held that respondent's refusal to effectuate the contract was a refusal to bargain, 29 U.S.C. § 158(a) (5), and an interference with employees in their rights under the Act,

2. The relevant provisions of each appear below. Article 19, § 3 of the parent's constitution:

No Local Union Officer, International Officer, or International Representative shall have the authority to negotiate the terms of a contract or any supplement thereof with any employer without first obtaining the approval of the Local Union. After negotiations have been concluded with the employer, the proposed contract or supplement shall be submitted to the vote of the Local Union membership or Manufacturing Unit membership in the case of an Amalgamated Local Union at a meeting called especially for such purpose; should the proposed contract or supplement be approved by a majority vote of the Local Union or unit members present at the meeting, it shall be referred to the Regional Director for his recommendation to the International Executive Board for its approval or rejection. In case the regional Board Member recommends approval, the contract becomes operative until the final action is taken by the International Executive Board.

Article X of the local's Bylaws:

(b) After negotiations have been concluded with the employer, the proposed contract shall be submitted to the vote of the employees of the employer at a special meeting called for such purpose on due notice.

(c) After approval by a majority vote of those present and voting at the meeting, the contract shall be referred to the Regional Director by the Local Union.

29 U.S.C. § 158(a) (1). 156 N.L.R.B. 903 (1966). The Board reasoned that:

> If, as claimed by Respondent, an employer were free to challenge the union's assertion that ratification had taken place, it would be difficult, if not impossible, for the parties to a collective-bargaining agreement to arrive at a final settlement without the fear of being forced into protracted litigation regarding the union's compliance with its own procedures, clearly a collateral issue. The encouragement of such industrial instability could not have been within the intendment of the Act.

It held that:

> [W]here, as here, the parties have agreed that their contract shall be made contingent upon ratification by the employees, a vote is held showing majority approval which is not challenged at the time, and the union certifies to the employer that such ratification has been achieved, the employer may not avoid its contract by challenging the validity of the internal union procedures by which it was ratified. [Footnotes omitted.]

The Board ordered respondent to cease and desist from refusing to bargain with the Union, and from similarly interfering with the employees in the exercise of the right to self-oragnization. Affirmatively, respondent was ordered—but only upon the request of the Union—to give effect retroactively to the terms of the August 1964 agreement, and to make employees whole for losses suffered by reason of the refusal to effectuate the agreement. However, if the Union so chose, the order required respondent to negotiate with the Union anew.

 Respondent opposes the Board's petition on several grounds. Respondent first argues that there could be no violation of section 8(a) (5), citing

the Supreme Court's observation that "breach of contract is not an 'unfair labor practice,'" see Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp., 348 U.S. 437, 443–444 n. 2, 75 S.Ct. 489, 492, 99 L.Ed. 510 (1955). Although Mr. Justice Frankfurter was there speaking for only three justices, we accept the dictum,[3] but we understand it to mean simply that failure to accord with a contractual provision is not *ipso facto* an unfair labor practice. However, respondent apparently offers a more extreme proposition—that no breach of contract can also be an unfair labor practice. We do not so read the law. In NLRB v. C & C Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967), an employer's unilateral institution of a premium pay plan violated a collective bargaining agreement, yet was held to be an unfair labor practice—indeed, as here, a refusal to bargain. See also Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956); NLRB v. Hyde, 339 F.2d 568, 572 (9th Cir. 1964). As a variant of this approach, respondent claims that the proper forum for resolution of this dispute was not the Board, but the courts; the argument is couched in jurisdictional terms. Once again, if all this means is that the Board does not have general jurisdiction to police collective bargaining agreements, we agree. C & C Plywood Corp., supra, 385 U.S. at 427, 87 S.Ct. 559. But respondent seeks the broad rule that a question of contract interpretation must divest the Board of power, thus turning around the preemption argument that the possibility of an unfair labor practice ousts the judicial forum. See generally Severn, *Section 301 and the Primary Jurisdiction of the NLRB*, 76 Harv.L.Rev. 529 (1963). We reject this suggestion. An employer's duty to bargain under section 8(a) (5) would be empty, indeed, if after reaching agreement the employer could

---

3. We also recognize that the holding of *Westinghouse* is no longer authoritative. See General Drivers, etc., Local Union No. 89 v. Riss & Co., 372 U.S. 517, 520, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963) (per curiam); Smith v. Evening News Ass'n, 371 U.S. 195, 199, 83 S.Ct. 267, 9 L.Ed. 2d 246 (1962).

treat the contract as a scrap of paper. The disavowal of the entire contract by respondent—on a ground the Board and we hold unjustified—made the prior bargaining worse than useless. In terms of effect on the rights of employees, the Union's position as bargaining agent, and the purpose of the Act to substitute collective bargaining for economic warfare, it is difficult to distinguish the total repudiation here practiced from the employer's refusal in H. J. Heinz Co. v. NLRB, 311 U.S. 514, 525–526, 61 S.Ct. 320, 85 L.Ed. 309 (1941), to put an oral agreement into writing. Cf. 29 U.S.C. § 158(d).

 That other remedies may be available to the Union is not controlling, any more than it was in NLRB v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). In that case, the Board found an employer's refusal to furnish certain information to a union to be an unfair labor practice, even though the union might have obtained relief through arbitration (a remedial route attempted here by the Union but resisted by respondent).[4] In Smith v. Evening News Ass'n, 371 U.S. 195, 197, 83 S.Ct. 267, 269, 9 L.Ed.2d 246 (1962), the Court pointed out that: "The authority of the Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301 * * *."[5] We do not hold that the Board has "generalized power to determine the rights of parties under all collective agreements," see C & C Plywood Corp., supra, 385 U.S. at 427, 87 S.Ct. at 563. But where the charge is made that an employer has violated the statutory rights of employees by refusing to honor in any manner an agreement which was the product of collective bargaining, the Board can review the facts to determine whether the repudiation was justified. As a final version of its jurisdictional point, respondent says that the Board is powerless to direct performance of a contract. The short answer is that the Board had jurisdiction to find an unfair labor practice and to remedy it. Cf. NLRB v. Warrensburg Board & Paper Corp., 340 F.2d 920 (2d Cir. 1965) (employer directed to execute contract with new terminal date); Lozano Enterprises v. NLRB, 327 F.2d 814, 819 (9th Cir. 1964) (not enough to sign contract; employer had to deliver executed contract to union); NLRB v. Hyde, supra.

██ Respondent also contends that its "good faith" allowed it to maintain "forever" its position that the contract had not come into existence. It is true that discussions of the duty of collective bargaining under the Act frequently emphasize the requirement of good faith, e. g., NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 402–404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). But respondent misconceives the statutory duty, which includes not only a state of mind but also objective acts. There are situations in which it is not enough that an employer is convinced he is right; in such circumstances, an employer's state of mind is irrelevant and he acts at his peril. See cases collected in Duvin, *The Duty to Bargain: Law in Search of Policy*, 64 Colum.L.Rev. 248, 266–86 (1964). Thus, in *C & C Plywood Corp.*, supra, the Court of Appeals for the Ninth Circuit refused to enforce the Board's order because of "a good-faith dispute as to the correct meaning of the provisions of the collective-bargaining agreement." 351 F.2d 224, 228 (1965). In reversing, the Supreme Court did not question the employer's good faith. It was enough that the employer's interpretation of the contract was wrong and that the Board had

---

4. The Board, however, may decide to stay its hand and defer to arbitration proceedings. See Lodge 743, Intern. Ass'n of Machinists v. United Aircraft Corp., 337 F.2d 5, 11 (2d Cir.1964), cert. denied, 380 U.S. 908, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965); Flintkote Co., 149 N.L.R.B. 1561 (1964); Spielberg Mfg. Co., 112 N.L.R.B. 1080 (1955).

5. Cf. Vaca v. Sipes, 386 U.S. 171, 178–84, 87 S.Ct. 903, 17 L.Ed.2d 842 (Feb. 27, 1967); Genesco, Inc. v. Joint Council 13, United Shoe Workers, 341 F.2d 482 (2d Cir. 1965).

found that the employer had, therefore, failed to bargain. Similarly, in NLRB v. Katz, 369 U.S. 736, 742–743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), an employer violated the duty of bargaining collectively by unilaterally putting into effect certain wage increases and other benefits even though the Board did not find subjective bad faith. See also United Aircraft Corp. v. NLRB, 333 F.2d 819, 822 (2d Cir. 1964), cert. denied, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 796 (1965) (a good faith belief that trainees were not properly members of a bargaining unit did not insulate an employer against a refusal to bargain finding). Thus, while there might have been good faith here, there was still total repudiation of the contract and a resultant failure to bargain.

Finally, respondent claims that the Board's finding of ratification is not supported by substantial evidence. At first blush this point does not seem strong on this record. There is no claim here, as there was before the Board, that the allegations of a "quick" and incorrect vote count were true. Respondent offered no evidence before the examiner as to what transpired at the crucial union meeting and respondent now agrees with the examiner that the telephone calls and letter purportedly from employees were inadmissible to prove the truth of the assertions contained therein.[6] Therefore, in the ordinary sense that the facts of union ratification were as the Board found them, there is not only substantial evidence but no dispute.

However, respondent's point is more subtle. What it claims is that the ratification procedure was defective under "ordinary principles of contract law." The procedure used was, it is true, informal but practical. After full discussion of the alternatives of strike or ratification, the Union president first called for votes for a strike; less than a majority were for that. Pursuing the question further, he asked for votes against ratification and again slightly less than a majority so responded. However, respondent complains that no one actually voted for ratification and therefore there was none. The Board disagreed, pointing out that the vote did show majority approval of the contract and no one complained of the vote or the procedure at the time. Having explained the practical alternatives, for the Union president to ask for a show of hands in opposition to ratification does not seem unreasonable to us. In enforcing the National Labor Relations Act, it is not necessary to import either Robert's Rules of Order or common-law intricacies.[7]

The Board also held, in effect, that respondent had no standing to challenge the Union's report of ratification, see North Country Motors, Ltd., 146 N.L. R.B. 671 (1964). It reasoned that to rule otherwise undermines the collective bargaining representative and encourages industrial instability. See NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 350, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); cf. Vaca v. Sipes, 386 U.S. 171, 191–192, 87 S.Ct. 903, 17 L.Ed.2d 842 (Feb. 27, 1967); Pullman Co. v. Order of Ry. Conductors, 316 F.2d 556, 563 (7th Cir.), cert. denied, 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963); NLRB v. Darlington Veneer Co., 236 F.2d 85 (4th Cir. 1956). It also pointed out that "other recourse is available to provide a remedy" for violation of employees' rights by "irregular or unlawful internal procedures," presumably a reference at least to the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 411–415 or to decertification procedures under the National Labor Relations Act. While the reasoning has force, we need not decide the point since

---

6. Respondent asserts here that they were offered only to prove its good faith.

7. "In reaching this conclusion [in interpreting a labor agreement], the Board relied upon its experience with labor relations and the Act's clear emphasis upon the protection of free collective bargaining. We cannot disapprove of the Board's approach." See *C & C Plywood Corp.*, supra, 385 U.S. at 430, 87 S.Ct. at 565.

the Board's finding of ratification here must stand.

 Two final points remain. Respondent asks for a remand to allow it to prove that the vote count was improper and that the employees did complain at the time; it had an opportunity to present this evidence before the Board, and chose not to do so. Further delay in redressing this aging unfair labor practice would be unwarranted. Finally, the Board's order apparently requires bargaining on a new agreement if the Union prefers this to retroactive enforcement of the old one. On this subject, Judge Sobeloff said in NLRB v. Huttig Sash & Door Co., 362 F.2d 217, 220 (4th Cir. 1966):

> The whole basis of the Board's case is that the employer and the union reached agreement * * *. The Board may not allow the union to stand on the agreement and at the same time unilaterally to abrogate it and demand negotiations for a new contract. Of course, if complete accord had not been reached * * *, a bargaining order might be eminently appropriate, but where the Board has found that an agreement had been reached, it is inconsistent and unreasonable to allow the union the option of binding the employer to the agreement or of abrogating the contract and requesting negotiations anew. [Footnotes omitted.]

This statement is persuasive, but we note that after the Board in *Huttig* called to the court's attention, *inter alia*, that the issue was neither briefed nor argued, and that the decision was "academic" since the old contract had expired and the parties were required to bargain anew regardless of the Board's order, the court on rehearing said that it would not consider itself bound by the above quoted words. Here, too, neither respondent nor the Board has made much

of this portion of the order so that we really do not know whether respondent objects to it, or what the response of the Board or the intervenor Union might be. Moreover, we cannot be sure from the record whether the contract expires shortly so that bargaining on a new contract would again be in order.[8] Under these circumstances, we will enforce the order in its present form.

Enforcement granted.

---

8. The handwritten memorandum agreement dated August 10, 1964, apparently incorporates the printed association contract, which has a three-year term. However, the memorandum also provides for periodic economic benefits, some of which commence in 1968.