BROTHERHOOD OF RAILROAD TRAINMEN, JOHN B. GORDON LODGE NO. 376 et al., Appellants,

v.

SOUTHERN RAILWAY COMPANY, Georgia Southern and Florida Railway Company, Appellees.

No. 23384.

United States Court of Appeals Fifth Circuit.

April 11, 1968.

Rehearing Denied May 28, 1968.

Milton Kramer, Washington, D. C., David L. Mincey, Macon, Ga., for appellants.

A. J. Land, Columbus, Ga., Martin M. Lucente, Chicago, Ill., Charles J. Bloch, Macon, Ga., John B. Miller, Savannah, Ga., James H. Wilson, Jr., Atlanta, Ga., for appellees.

Before THORNBERRY and COLEMAN, Circuit Judges, and YOUNG, District Judge.

GEORGE C. YOUNG, District Judge:

Appellants, defendants below, are the Brotherhood of Railroad Trainmen (a labor organization and collective bargaining representative for trainmen), John B. Gordon Lodge No. 376, a subordinate lodge of the Brotherhood, and numerous named officers and employees of either the Brotherhood or Lodge (sometimes hereinafter collectively "unions"). Appellees, plaintiffs below, are Southern Railway Company and Georgia Southern and Florida Railway Company (sometimes hereinafter collectively "railroads").

On July 16, 1952, the Railroads and the Brotherhood entered into an agreement providing for the pooling of cabooses. The agreement contained several paragraphs concerning—in general terms—supplies and sanitary conditions on cabooses. By letter dated November 17, 1964, (Appendix A), the Brotherhood served notice under Section 6, of the Railway Labor Act, 45 U.S.C.A. § 156, of a desire to change certain provisions of that agreement relating to facilities in and conditions of cabooses operated by the railroads. Upon failure to resolve the dispute, the Brotherhood applied to the National Mediation Board to mediate. Mediation being unsuccessful, the Board offered to arbitrate but was rejected by the Brotherhood so that the Board terminated its services on October 19, 1965.

On October 23 and 30, 1965, the Railroads issued bulletins amending their operating rules requiring that thereafter both trainmen in a train crew ride in the locomotive. Prior to that change one trainman had been assigned to the locomotive and the other to the caboose.

On October 29, 1965, the Brotherhood transmitted a Section 6 notice to the Railroads concerning seating facilities for trainmen required to ride on locomotives.[1]

On December 3, 1965, the appellants struck; picket lines were formed, and

---

1. At the time this case was tried in the district court that notice was still being negotiated and had not yet been mediated by the National Mediation Board.

railroad service halted. A temporary restraining order issued December 4, 1965, effective by later extension until December 23, 1965. After an evidentiary hearing the Court below, on December 22, 1965, granted a permanent injunction which is appealed here.

The Railway Labor Act, 45 U.S.C.A. § 151 et seq., requires that certain procedural devices be exhausted in an attempt to amicably resolve major disputes prior to resort to self help. Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 725, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). Included in the procedural requirements precedent to resort to self help, when a major dispute is in issue, is the requirement that a party desiring changes in an existing agreement give at least thirty (30) days written notice to the opposing party of the changes desired. Railway Labor Act, § 6, 45 U.S.C.A. § 156. The Brotherhood served such a notice by letter of November 17, 1964. It was alleged, the court below found, and it is nowhere disputed, that the strike of December 3, 1965, was in furtherance of the demands contained in the letter of November 17, 1964. (Appendix A)

Although the notice by its terms is directed toward the conditions of cabooses, appellants urge the Court to broadly construe the notice as one demanding improved working conditions generally, rather than only working conditions on cabooses. They contend that all demands contained in the notice with the exception of paragraphs 6, 14, and part of paragraph 8, are concerned with facilities for the use of trainmen which are not dependent upon a trainman riding the caboose. The district court found that the notice could not be construed so broadly and that both the notice and the strike were, as a matter of fact, in furtherance of demands for improvements located on cabooses only. We find no error in that determination.

The district court found further, that by virtue of the change in operating rules brought about by the promulgation of the October 23, and 30, 1965 bulletins, the unions no longer had any valid interest in the conditions of cabooses and therefore that their strike was not in furtherance of a valid labor dispute. The unions submit that this factual finding is error and urge this Court to find that the unions did, in fact, have a valid interest in the condition of cabooses on the date of the strike.

While conceding that the demands in a part of paragraph 8, and all of paragraphs 6 and 14, became inapplicable (by the October 23, 1965, rule change) to the trainmen since they no longer ride in a caboose, appellants claim that, as a matter of fact, trainmen still use cabooses and therefore have a legitimate "working conditions" interest in cabooses. On this point appellants cite as error the district court's finding that "a caboose is not now used for any purpose by trainmen here involved."

The district court found the railroads entitled to an injunction on either of two grounds:

1. The facilities of a caboose did not (on the date of the strike) constitute a part of the working conditions of the appellant trainmen; and

2. Even if the trainmen did have sufficient interest in the caboose facilities to be considered "working conditions", a new Section 6 notice was required because of the new conditions resulting from the changed operating rules.

We will consider both grounds separately.

## PART ONE

The district court, having first found that the trainmen had no "working conditions" interest in the cabooses, next found that the trainmen's demands relative to cabooses were unlawful and therefore in violation of the general policy of the Railway Labor Act as established by

Sections 151a,[2] 152 First,[3] and Second,[4] justifying the issuance of the injunction on the showing of irreparable damage.

We believe the absolute finding of no interest by the trainmen in cabooses to be in error.

Mr. F. A. Hardin, a Southern Railway trainman and conductor since 1940, and an officer of the General Committee of the Brotherhood of the Southern (Lines East) testified that a caboose has always been used by members of a crew other than just those who rode in it; that crews in local freight service cook their meals in a caboose and use the refrigerators and running water; that the head-end brakeman on a local freight used a caboose locker to keep his rain gear, rubber boots, extra lantern, gloves and canned goods although he never rode on the caboose as part of his working assignment; that even after the change in operating rules, trainmen in local freight service, mine run service, work train service, and road switcher service still use cabooses; that men assigned to a run starting at an away-from-home terminal are dead-headed there on the last available passenger train causing the men to arrive at outlying points two to five hours before going on duty during which time they have the right to utilize the caboose facilities.[5]

Former head brakemen and flagmen (now in supervisory positions) testified for the railroads as to their not using cabooses and as to trainmen in through service not now having need for caboose facilities. If their testimony and that of Hardin's had been in direct conflict it would, of course, have been within the province of the trier of the facts to resolve the conflict which findings would not be set aside unless clearly erroneous giving due regard to the opportunity of the trial court to judge the credibility of the witnesses,[6] but the testimony was not directly conflicting. While the railroad witnesses' testimony concerned primarily their own preferences and personal non-use of cabooses, the trainmen's witness testified to the opportunity of trainmen (particularly on local freight trains) to use caboose facilities. This latter evidence stands undisputed and renders the finding that trainmen have no use for caboose facilities erroneous. True, the use is somewhat less and different than before the change in operating rules, but it cannot be said that the trainmen have *no* use whatsoever for caboose facilities.

Having found, as we have, a continuing interest by the trainmen in cabooses, it follows that this case is a controversy concerning conditions of employment so that it is a labor dispute within

2. Section 151a provides:
"The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; * * * (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions."

3. Section 152 First provides:
"It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or

otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

4. Section 152 Second provides:
"All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute."

5. TR 248–254.

6. Rule 52(a), Federal Rules of Civil Procedure.

the meaning of the Norris-LaGuardia Act.[7]

In any case involving or growing out of any labor dispute that Act bars injunctive relief by a federal court[8] except to restrain unlawful acts[9] or a violation of the Railway Labor Act[10] or as otherwise authorized by law.

In addition to reliance on the general policy provisions of the Railway Labor Act, the district court in finding an unlawful action enjoinable under that Act, relied in part upon the holding of this circuit in Brotherhood of Railroad Trainmen v. Central of Georgia Ry. Co., 305 F.2d 605 (5th Cir. 1962). In that case the Court found a possible violation of Section 152 Third by the carrier, and held that if the evidence supported such a finding, an injunction would be an appropriate remedy. However, Section 152 Third is more than a general policy statement. It specifically prohibits interference by the carrier with the designation of representatives by the union.[11]

Sections 151a, 152 First and 152 Second, relied upon by the district court as basis for jurisdiction and for the issuance of an injunction, are general statements of policy, implemented and given specific direction by subsequent sections of the Act.

Believing, as we do, that this case involves or grows out of a labor dispute, Order of Railroad Telegraphers v. Chicago & N. W. R. Co., 362 U.S. 330, 80 S. Ct. 761, 4 L.Ed.2d 774 (1960) is in point and raises the bar of the Norris-LaGuardia Act to injunctive relief in the absence of a "specific legal command that the union violated." In that case Mr. Justice Black, speaking for the majority, said:

"* * * The railroad has argued throughout the proceedings that the union's strike here may be enjoined, regardless of Norris-LaGuardia, because its effort to bargain about the consolidation and abandonment of railroad stations is unlawful. It is true that in a series of cases where collective bargaining agents stepped outside their legal duties and violated the Act which called them into being, we held that they could be enjoined. None of these cases, however, enjoined conduct which the Norris-LaGuardia Act withdrew from the injunctive power of the federal courts except the Chicago River Case which held that a strike could be enjoined to prevent a plain violation of a basic command of the Railway Labor Act 'adopted as a part of a pattern of labor legislation.' The Court there regarded as inapposite those cases in which it was held that the Norris-LaGuardia Act's ban on federal injunctions is not lifted because the conduct of the union is unlawful under some other, nonlabor statute. Here, far from violating the Railway Labor Act, the union's effort to negotiate its controversy with the railroad was in obedience to the Act's command that employees as well as railroads exert

---

7. "Labor dispute is defined by the Norris-LaGuardia Act, 29 U.S.C.A., Sec. 113(c), as including: "* * * any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

8. 29 U.S.C.A., Sec. 104, which provides in part:
"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
(a) Ceasing or refusing to perform any work or to remain in any relation of employment * * *."

9. 29 U.S.C.A., Sec. 107.

10. Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).

11. In fact, violation of Section 152 Third is made a criminal offense by Section 152 Tenth, and the latter section omits mention of Sections 152 First and Second.

every reasonable effort to settle all disputes 'concerning rates of pay, rules, and working conditions.' 45 U. S.C.A. § 152, subd. 1. Moreover, neither the respondent nor anyone else points to any other specific legal command that the union violated here by attempting to bring about a change in its collective bargaining agreement. * * *"

■ Therefore we conclude the district court was in error in basing the issuance of an injunction in the circumstances of this case on Sections 151a, 152 First, and 152 Second of the Railway Labor Act.[12]

## PART TWO

Having determined that the strike was called pursuant to a labor dispute, we next conclude it was a so-called "major dispute" within the meaning of the decisions of the Supreme Court and this Court. In Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 723,[13] a "major dispute" has been distinguished from a minor dispute:

"The first (the major dispute) relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

The second class (the minor dispute), however, contemplates the existence of a collective agreement al-

ready concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one."

■ The dispute clearly concerned an effort by the trainmen to secure changed working conditions (on cabooses) and did not involve an interpretation of an existing agreement.

The railroads contended, and the trial judge found, that the rule change requiring both of the trainmen in a crew to ride in the locomotive resulted in the November 17, 1964, Section 6 notice never being negotiated or mediated under conditions existing on the date of the strike. He held that the trainmen should have served a new Section 6 notice so that the parties could negotiate and mediate under the changed conditions.

If the November 17, 1964, Section 6 notice properly raised the issues involved in the strike and the procedures of the Railway Labor Act were followed and exhausted pursuant to that notice, then the strike could not be enjoined as the Norris-LaGuardia Act would bar such action. In reference to a "major dispute", Judge (now Chief Judge) Brown of this Court considered the rights available to management and labor after exhausting the procedures of the Railway Labor Act, and said:

"Indeed, the unquestioned right to resort to self-help is the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration. Cf. NLRB v. Radio & Television Broadcast Eng'rs Union, Local 1212, 1961, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302. That the occasions for resort to this raw power

---

12. We recognize and acknowledge that the district judge's reliance on the general policy provisions of the Railway Labor Act were premised on his factual finding (with which we disagree) that the trainmen had no interest in cabooses at the time of the strike. Because of our holding that a labor dispute exists and because of our conclusions hereinafter set forth in Part Two of this opinion, it is unnecessary for us to consider the force and effect of those general policy provi-

sions in the case of a strike not involving or arising out of a labor dispute within the meaning of the Norris-LaGuardia Act.

13. Order of Railroad Telegraphers v. Chicago & N. W. Ry., 1960, 362 U.S. 330, 341, 80 S.Ct. 761, 4 L.Ed.2d 774; Missouri-Kansas-Texas R.R. v. Brotherhood of Locomotive Engineers, 266 F.2d 335 (5th Cir. 1955); Florida E. C. Ry. Co. v. Brotherhood of R.R. Trainmen, 336 F. 2d 172 (5th Cir. 1964).

will be rare under a system which hedges in disputes by elaborate negotiations, mediation and Presidential fact finding machinery, does not deny either the existence of the power, or the present policy determination that, awesome as is its prospect, it is the only way to preserve the last vestige of free contracts, freely made.

Since the right surely exists, the law must accommodate itself to the exercise of this power in a way that will make it effectual. Brotherhood of Railroad Trainmen v. Chicago R. & I. R.R., 1957, 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622. Anything less either temporized with the so-far-determined policy against compulsory arbitration, or puts the full weight of law on the side of the employees by making it impossible for the Railroad to carry on save on the terms and conditions imposed by the organized employees who now refuse to perform as agreed.

To be sure, the law gives much power to organized labor. It discourages, on every hand, industrial and railroad labor strike[s], walkouts, lockouts, and strikes. But when the machinery of industrial peace fails, the policy in all national labor legislation is to let loose the full economic power of each. On the side of labor, it is the cherished right to strike. On management, the right to operate, or at least the right to try to operate. * * *" Florida E. C. Ry. Co. v. Brotherhood of R. Trainmen, 336 F.2d 172, 181 (5th Cir. 1964).

The Section 6 notice of November 17, 1964, set forth a number of demands in which the non-caboose riding trainmen would still have an interest, such as better sanitation, toilet facilities, drinking water equipment, ice containers and ice, and weatherproofing.

■ Appellants rely on Pullman Company v. Order of Ry. Conductors and Brakemen, 316 F.2d 556 (7th Cir. 1963), cert. den. 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54; Akron, Canton & Youngstown R. R. et al. v. Int'l Brotherhood of Electrical Workers, et al., 237 F.Supp. 343 (N.D.Ill., 1964), and Flight Engineers International Association, Eal Chapter, AFL–CIO v. Eastern Air Lines, 208 F.Supp. 182 (S.D.N.Y., 1962), affirmed 307 F.2d 510 (2nd Cir. 1962); cert. den. 372 U.S. 945, 83 S.Ct. 934, 9 L.Ed.2d 970; to support their contention that the demands of the strike were within the scope of the November 17, 1964, Section 6 notice, while conceding that some of the original requests are no longer of interest to non-caboose riding trainmen. It was held in *Pullman*, supra, that:

"We believe that a Section 6 notice is adequate if it informs a party of the purpose sought to be attained by the other party with sufficient definition to enable the former to understand the implications of the notice and proposed means adapted to the goal's attainment." 316 F.2d 556 at page 562.

■ We conclude that the operating rules change did not sufficiently alter the circumstances to require a new Section 6 notice. *Decreased* demands cannot be equated to *different* demands; the fact that the trainmen lost interest in some of their original requests should not require a new round of mediation on the remaining issues.

■ The unions having complied with the procedures of the Railway Labor Act they were free to resort to self-help by striking. Florida E. C. Ry. Co. v. Brotherhood of R. Trainmen, supra.

The railroads alleged in their complaint that the work stoppage was causing immediate, substantial and irreparable injury, loss and damage to the railroads and to the public by seriously and substantially disrupting and impairing the railroads' ability to carry out their obligations under the Interstate Commerce Act.[14]

■ The findings by the district judge that such allegations had been

14. 49 U.S.C.A. Section 1 et seq.

proved were fully supported by the evidence. The Southern Railway System and their affiliated lines transported approximately 100,000 passengers and 9,500,000 tons of freight per month over 10,000 miles of interconnected railroads, in 13 states, serving about 1,200 stations of which 975 were served only by one or both of plaintiff railroads. The withdrawal from work by the trainmen and their picket lines on December 3, 1964, resulted in cancellation of all passenger trains and in a number of trains already enroute being stalled at intermediate points, stranding passengers and mail.

However, despite the consequences of the strike, the Norris-LaGuardia Act has clearly withheld jurisdiction from the federal courts to issue an injunction in this case involving or growing out of a labor dispute and where the procedures of the Railway Labor Act have been properly followed and exhausted. The judgment granting the permanent injunction is, therefore,

Reversed.

## APPENDIX A

W. M. CAMP, Vice-Chmn.
1345 Lanvale Drive SW
Atlanta, Georgia

G. H. DICKENS, Secretary
413 Burns Road
Knoxville, Tennessee

General Grievance Committee
Brotherhood of Railroad Trainmen
Southern Railway (Lines East)

F. A. Hardin, Chairman
Ninth Floor Jackson Building
Asheville, North Carolina

(LABEL)

November 17, 1964

Mr. L. G. Tolleson
Assistant Vice President, Labor Relations
Southern Railway System
Washington, D. C.
Dear Sir:

For a period of several years, our Organization has handled various complaints of employees dealing with the deplorable conditions of cabooses furnished to crews in freight service. From time to time, we have been assured that various programs were either contemplated or under way whereby such cabooses would be properly supplied, would be of sound construction and maintenance, and would be in condition for safe and proper operation, furnishing suitable facilities for the men using them. Little, if anything, however, has been done and the problems have simply worsened all over the property.

Therefore, please accept this as formal notice under Section 6 of the Railway Labor Act, as amended, of the desire of the Brotherhood of Railroad Trainmen to cancel Items 5, 6, 7, 8, 9 and 10 of the Memorandum Agreement of July 16, 1952, providing for the pooling of certain cabooses and substitute therefor, the following as new rules of that Agreement:

5. The Carrier will furnish for all crews in freight service a modern caboose of all-steel body construction which shall be equipped with electric lights at least 4 in number and each equivalent to at least 75 watts, with safety glass in all doors and windows, and with floors of wooden or metal con-

struction. Each such caboose shall be equipped with external bunkers for the storing of all flammables.

6. Each occupant of such caboose shall be provided with an individual seat equipped with sufficient cushions of shock-absorbent material to insure the greatest possible protection against slack action and related shocks, and each such occupant shall be provided with a seat belt and shoulder harness of nylon or similar material.

7. Heating facilities capable of maintaining a temperature of at least 70 degrees Fahrenheit inside the caboose shall be installed and maintained at standard efficiency.

8. Weatherstripping or weatherproof sash shall be installed and maintained at all windows and doors sufficient to protect against inclement weather and seepage of dust or dirt. Each door and window shall be kept in proper repair and condition to permit opening or closing at all times. Windows provided for observation of trains shall be equipped with an electrically-operated wiper kept in proper working order. Cracked or broken glass shall be promptly replaced and all window glass shall be cleaned as often as necessary to insure maximum visibility.

9. Drinking water facilities shall be installed and maintained so as to provide fresh and pure drinking water on all cabooses. Containers for drinking water shall be kept clean at all times, shall be drained and flushed at the end of each use of the caboose by a train crew, and will be refilled no later than six hours before the beginning of another working day or road trip by any crew.

10. Each caboose shall be provided with a suitable container for ice, separate from other facilities and sufficient ice will be furnished so that not less than fifty pounds of ice is available for use by train crews at all times while on duty or while the crew using caboose is away from the terminal of their assignment.

11. The Carrier shall be responsible for supplying, maintaining and cleaning of all cabooses and no crew will be required to depart their terminal or begin a working day until furnished a caboose properly supplied, maintained and cleaned as contemplated by this Agreement. Supplying includes the placing on each caboose of any and all materials needed or required by the crew for the performance of their duties. Cleaning includes sweeping, dusting and mopping of the interior of each caboose periodically, at least once per week, to insure a reasonable standard of cleanliness and sanitation.

12. Each caboose shall be supplied with fresh water and facilities for the washing of hands and face, with proper and adequate drainage thereof, with paper towels in dispenser, with sanitary drinking cups in dispenser, with sufficient fuel, and with hand soap in an appropriate dispenser.

13. Each caboose shall be equipped with sanitary, flush-type, enclosed toilet facilities which shall be of such construction and design as to prevent return of outside air or moisture and which shall be as nearly comparable to such facilities provided on standard railroad passenger cars as possible.

14. Each caboose shall be equipped with wheels, trucks, and draft gear of such design, construction and maintenance as to insure maximum safety and riding comfort.

15. No train crew will be required to depart the terminal of their assignment or begin their working

day without being furnished a caboose in compliance with this Agreement, the sole responsibility for such compliance being that of the Carrier, and no trainman will be subjected to disciplinary action or reprisal of any nature for failure to depart the terminal or begin his working day when not furnished such a caboose.

16. Should Carrier's compliance or non-compliance with the provisions of this Agreement result in any loss of earnings by a trainman on any calendar day, such trainman shall be paid the mileage or earnings of his assignment for that day separate and apart from any other monetary payments made to him for that day.

Will you please reply to this proposal in writing to the undersigned, fixing date for conference within the provisions of the Railway Labor Act, as amended, for the purpose of discussing the matter?

Yours very truly,

(Signed)  F. A. HARDIN

F. A. Hardin
General Chairman B. R. T.